# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **KEDRON JONES JR.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Case No. 10 C 313** |
| **v.** | ) | |
| | ) | |
| **EVARISTO AGUINALDO, PARTHA** | ) | **Magistrate Judge Geraldine Soat Brown** |
| **GHOSH, LIPING ZHANG, AND** | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kendron Jones, Jr., has been an inmate at Stateville Correctional Center since June 2004. (Am. Compl. ¶¶ 1, 11.) [Dkt 45.]  He claims that the defendants Dr. Evaristo Aguinaldo, Dr. Partha Ghosh, Dr. Liping Zhang, and Wexford Health Sources, Inc., who provided medical services at Stateville, were deliberately indifferent to his serious medical needs. (*Id*. ¶¶ 22-24.)  Before the court is defendants' Motion for Summary Judgment. (Defs.' Mot.) [Dkt 107.][1]  For the reasons set forth below, defendants' motion is granted in part and denied in part.

---

[1]  Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), defendants filed a statement of material facts (Defs.' Facts) [dkt 106] and a memorandum of law in support of its motion (Defs.' Mem.) [dkt 108].  Plaintiff Kendron Jones, Jr. filed a memorandum of law in opposition to defendants' motion (Pl.'s Opp'n) [dkt 116], a response to defendants' statement of material facts (Pl.'s Fact Resp.) [dkt 114], and a statement of additional material facts with exhibits (Pl.'s Facts) [dkt 113].  Defendants filed a reply to plaintiff's statement of material facts (Defs.' Fact Reply) [dkt 120] and a reply to plaintiff's opposition (Defs.' Reply) [dkt 121].

## JURISDICTION

There is subject matter jurisdiction under 28 U.S.C. § 1331 because the action arises under 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution. The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636. [Dkt 63.]

## BACKGROUND

Jones's amended complaint alleges that defendants failed to treat his chronic epididymitis and severe abdominal pain properly from June 2004 through the filing of the amended complaint in November 2011. (Am. Comp. ¶¶ 11-24.)[2] All of Jones's claims relating to gastrointestinal problems were subsequently dismissed by agreement of the parties. (Order, Nov. 19, 2013.) [Dkt 101.] Similarly, Jones underwent cord denervation surgery in December 2013 which Jones expects will permanently relieve his pain from epididymitis. (Pl.'s Opp'n at 4.) Thus, the remaining issue in this case is Jones's claim that he endured years of unnecessary pain from epididymitis because defendants were deliberately indifferent to his medical needs. (*Id.* at 14.)

## FACTS[3]

_____

[2] Epididymitis is "inflammation of the epididymis," which is "the elongated cordlike structure along the posterior border of the testis, whose elongated coiled duct provides storage, transit, and maturation of spermatozoa and is continuous with the ductus deferens." *See Dorland's Illustrated Medical Dictionary* 632 (32d ed. 2012) [hereinafter *Dorland's*].

2

[3] Jones's Response to Defendants' Statement of Material Facts [dkt 114] fails to comply with Northern District of Illinois Local Rule 56.1(b)(3)(A), which requires that the non-movant's response contain numbered paragraphs "each corresponding to and stating a concise summary of the paragraph to which it is directed . . . ." The purpose of that rule is to allow the court to see in one document what is disputed and undisputed. Jones did not do that; rather he simply listed the

## Treatment at Cook County Department of Corrections

Jones claims that he developed "chronic testicular pain" as the result of a groin injury sustained while in the custody of the Chicago Police Department in April 2000. (Pl.'s Facts ¶¶ 1-2.) From April 2000 to June 2004, Jones was in the custody of the Cook County Department of Corrections ("CCDOC"). (Defs.' Facts ¶¶ 4-14.) Apparently, in 2011, while in CCDOC custody, Jones was referred to a urologist at Cermak Health Services. (Defs.' Fact Reply ¶ 4.) Jones was prescribed antibiotics and received nerve block treatments on April 1, 2004 and June 10, 2004 at Stroger Hospital. (*Id.* ¶ 4-5.) The April 2004 nerve block treatment was successful. (*Id.* ¶ 5.) The treating urologists noted that if the June nerve block treatment also proved successful, Jones would be considered for denervation surgery. (*Id.*) Jones was transferred to Stateville in June 2004. (Defs' Facts ¶ 14.)

The record on the present motion, however, raises a question about how much information defendants had about the treatment Jones received while he was in CCDOC custody. Defendants assert that only part of Jones's treatment records went with him to Stateville and that they had no records of his treatment at Stroger Hospital until after the present motion was filed. (Defs.' Reply at 4.) Jones's attorneys admit that they did not receive his records from Stroger Hospital until June 23, 2014. (Pl.'s Facts Resp. ¶ 8.) As far as the record on the present motion reveals, the only information defendants had about Jones's prior treatment at Stroger were Jones's own statements.

---

paragraphs that were undisputed. Accordingly, the court must look to Defendants' Statement of Facts to see what facts are undisputed. Unless otherwise indicated, citations to Defendants' Statement of Facts are to statements Jones does not dispute.

(*See* Defs.' Facts ¶ 8.) Jones's arguments that defendants "ignored" or "refused to continue" the treatment plan developed by Jones's urologist at Stroger (*see, e.g.*, Pl.'s Opp'n at 8), cannot be considered without some evidence that defendants were aware of that plan.

Defendants did receive medical records showing that Jones underwent four ultrasound tests while at CCDOC: on June 22, 2000, September 19, 2001, August 6, 2003, and September 30, 2003, with varying results. (Defs.' Facts ¶¶ 9-13.) The June 2000 ultrasound results were "highly suggestive of acute epididymitis." (*Id.* ¶ 10.) In the September 2001 ultrasound, Jones's testes and epididymis appeared normal. (*Id.* ¶ 11.) The August 2003 ultrasound results showed an enlarged left epididymis. (*Id.* ¶ 12.) In September 2003, the ultrasound revealed that Jones right epididymis was larger than the left, a finding consistent with chronic bilateral epididymitis. (*Id.* ¶ 13.)

### Treatment at Stateville

Wexford Health Sources, Inc., is a corporation that contracted with the Illinois Department of Corrections to provide health care services to inmates at Stateville Correctional Center. (Defs.' Facts ¶ 53.) Dr. Partha Ghosh was the On-site Medical Director for Wexford at Stateville from June 2003 through March 2011. (Defs.' Facts, Ex. B, Dep. of Partha Ghosh at 39-41.)[4] At his deposition, he testified about practices at Stateville during that time. Inmates could not see outside specialists without approval from him. (*Id.* at 15-16.) When a patient complained of testicular pain or chronic epididymitis, the typical course of treatment was to prescribe anti-inflammatory medication and pain relievers. (*See id.* at 53-55.) If the pain did not resolve with such treatment, then the Medical

---

[4] Dr. Ghosh's deposition was taken in two sessions that were sequentially numbered: September 26, 2012 (Defs.' Facts, Ex. B); and October 16, 2012 (Defs.' Facts, Ex. C).

Director ordered a testicular ultrasound. (*Id.*) If that ultrasound did not show a tumor, then medical staff continued to treat the patient with antibiotics and pain medication. (*Id.* at 54-55.) In order for an inmate patient to be referred to a urologist, the Medical Director must write a "consult" to the medical records director of the prison, who then sends the consult and the appropriate documentation to Wexford's collegial review committee. (*Id.* at 90-91.) The collegial review committee would then consult with the Medical Director of the prison and determine whether the inmate patient would see a specialist. (*Id.* at 91-92.)

Between August 2004 and October 2009, Jones filed seven grievances complaining about lack of medical treatment. (Pl.'s Facts ¶ 16.) Dr. Ghosh was aware of Jones's complaints of chronic testicular pain and responded to four grievances he filed between 2005 and 2007, stating in each response that Jones's issue had been resolved. (Pl.'s Facts ¶ 17.)

In August 2004, Jones filed a grievance complaining that since his arrival at Stateville (in June) he had not received medications for pain and high blood pressure. (Pl.'s Facts, Ex. 8.) Chronic epidydimitis was only one of numerous medical problems he mentioned, which included prostate problems, arthritis, stroke, severe headache, and hypertension, which he called his "most serious" medical problem. (*Id.*) At his deposition, Jones did not recall whether he got a response to that grievance. (Defs.' Facts, Ex. A, Dep. Kendron Jones at 37-38.) The parties agree that between August 2004 and January 2007, Jones was treated on several occasions by various medical personnel at Stateville for gastrointestinal issues and epididymitis. (Defs.' Facts ¶ 15.)

In a grievance dated March 31, 2006, Jones wrote that he had been stomped in the groin by police during custodial interrogation, and was treated for his injuries while at CCDOC. (Pl.'s Facts,

Ex. 8.)  He reported that he was diagnosed with epididymitis and treated with antibiotics but the treatment was ineffective and the pain got worse.  (*Id.*)  He said that he had been seen by several urologists and later diagnosed with lesions on his left testicle.  (*Id.*)  He reported severe pain on his left testicle and asked to be seen by Dr. Ghosh and to be scheduled for an appointment with a urologist. (*Id.*)  That grievance does not mention his receiving any nerve blocks while at CCDOC.  Dr. Ghosh responded that Jones had been evaluated and treated appropriately the day before he wrote the grievance. (Jones Dep. at 40.)

Jones wrote a similar grievance on May 5, 2006, also complaining of pain and mentioning lesions on his left testicle.  (Pl.'s Facts, Ex. 8.)   He states he was seen at Stateville by a doctor on March 30, 2006, but given only Advil and an anti-inflammatory drug.  (*Id.*)

On September 2, 2006, Jones filed another grievance saying that he took antibiotics for three years at CCDOC "for what the doctors thought was epiditymites [sic]," until they ordered a test and found a lesion on his left testicle.  (*Id.*)  He stated that he was scheduled for an MRI and began to have a series of nerve blocks.  (*Id.*)   While he acknowledged seeing doctors several times at Stateville, he said that nothing ever happened.  He asked to see a urologist to stop the pain which he says was "throbbing" and "unbearable." (*Id.*)

On February 16, 2007, with  Dr. Ghosh's approval, Jones received a testicular ultrasound at the University of Illinois.  (Defs.' Facts ¶ 16.)  The ultrasound did not reveal any significant findings or presence of epididymitis.  (*Id.*)  That ultrasound appeared normal insofar as neither the testes nor the epididymis were enlarged and no tumors were present.  (Ghosh Dep. at 184-85.)  Jones admits that the ultrasound did not reveal the existence of epididimytis but argues that epididymitis is not

detectable from an ultrasound. (Pl.'s Fact Resp. ¶ 16.) Despite the normal ultrasound, Mr. Jones still complained of pain. (Ghosh Dep. at 185.) Dr. Ghosh testified that a complaint of pain in light of a normal ultrasound might suggest that the patient was exhibiting signs of somatization. (*Id.*)[5]

The parties agree that, following the February 2007 ultrasound, Jones was treated for gastrointestinal issues and epididymitis by various medical medical personnel at Stateville. (Defs.' Facts ¶ 17.) In May 2007, Jones wrote another grievance complaining of testicular pain but also arthritis in his neck and knees, "major back problems" and swollen feet. (Pl.'s Ex. 8.) In June 2007, Mr. Jones was seen by Dr. Arden, a psychiatrist. (Ghosh Dep. at 186.)

On June 21, 2007, Jones was treated by Dr. Aguinaldo, a staff physician at Stateville Correctional Center from 2001 through 2008, who saw Jones only on that single occasion. (Defs.' Facts ¶ 22.) Dr. Aguinaldo testified that his examination of Mr. Jones was normal. (*Id.*, Ex. E, Dep. of Evaristo Aguinaldo at 84.) At that visit, Mr. Jones complained of testicular pain in his left testicle on and off for seven years, but Dr. Aguinaldo's examination revealed no swelling, no tenderness and no palpable mass. (*Id.* at 83-84.) His notes indicated that Jones was alert, not distressed and laughing most of the time. (*Id*. at 83.) Jones also complained of low back pain, arthritis of the knee and neck, migraine headaches and chest pain. (*Id.*) Jones also requested a refill of Metamucil for constipation. (*Id*.) Dr. Aguinaldo prescribed Tylenol because Jones's pain was intermittent and there were no objective findings to warrant a referral to the Medical Director. (*Id.* at 85-87.)

Defendants dispute Jones's claim that, during the June 21, 2007 exam, Dr. Aguinaldo made inappropriate remarks to Jones regarding his pain, telling him he should masturbate more often in

---

[5] Somatization is "in psychiatry, the conversion of mental experiences or states into bodily symptoms." *Dorland's* at 1734.

order to alleviate his pain and that sleeping on the floor was a good thing. (See Defs.' Fact Reply ¶ 14.) At his deposition, Dr. Aguinaldo testified that while he does not have an independent recollection of everything that was said at the June 21, 2007 examination of Jones, he would not make those kinds of remarks to anyone under any circumstances. (Aguinaldo Dep. at 134-36.)

Dr. Aguinaldo testified that as a staff physician at Stateville, he would first treat epididymitis with antibiotics or pain relievers, and if that did not resolve the patient's issues, then he would refer the patient to the Medical Director. (*Id*. at 62.) Only the Medical Director of Stateville had the authority to refer a patient to a specialist such as a urologist. (*Id*. at 69.) Dr. Aguilindo testified that prescribing pain medication such as Motrin or Tylenol for a patient with epididymitis was typical. (*Id*. at 73.)

Dr. Liping Zhang treated Jones at Stateville on six occasions between August 2008 and March 2010. (Defs.' Fact Reply ¶ 11.) Dr. Zhang was a staff physician with Wexford from 1995 to 2000 and 2006 to 2010. (Pl.'s Facts, Ex. 3, Dep. of Liping Zhang at 19, 27-29.) She worked at Joliet Correction Center from 1995 to 2000, Pontiac Correctional Center from 2006 until 2008 or 2009 and then transferred to Stateville until she was terminated by Wexford in 2010. (*Id.*)

Dr. Zhang first treated Jones on August 14, 2008 as part of her work with the chronic cardiac clinic at Stateville. (*Id.* at 97.)[6] Inmates with high blood pressure or chronic cardiac conditions were seen at the chronic cardiac clinic every three to six months, at which time they could also make other

---

[6] The record on the motion with respect to Dr. Zhang's treatment of Jones is not entirely clear. Only three pages of her treatment notes were included as exhibits. (Zhang Dep., Exs. 25, 27.) Her deposition testimony describes various treatments without specifying the dates but referring to various documents that are not part of the record. (*See, e.g.*, Zhang Dep. at 93-94 referring to "IDOC 301 and 302" which are not included in the record.)

complaints.  (*Id.* at 98.)  On that occasion, Dr. Zhang prescribed Doculax for Jones's chronic constipation, and saline and cortisporin for problems with his ear and nose.  (*Id.* at 97.)  There is no indication that Jones complained of testicular pain at that examination.  On August 27, 2008, Jones complained of two episodes of chest pain, as well as indigestion and constipation.  (*Id.* 89-92.)  Dr. Zhang prescribed Zantac, an antacid, and milk of magnesia.  (*Id.*)  Dr. Zhang saw Jones again at the chronic cardiac clinic in December 2008.  (*Id.* at 117-121.)  At that visit, she prescribed Jones medication for constipation and blood pressure as well as skin cream and aspirin.  (*Id.* at 119.)  She also treated him for a minor ear infection. (*Id.* at 120.)

Dr. Zhang treated Jones again in January 2009.  (*Id.* at 99-101.)  At that visit, Jones had a number of complaints, the chief one being constipation for which she prescribed Doculax.  (*Id.* 101-02.)  Dr. Zhang also noted Jones was dealing with epididymitis for which she prescribed an antibiotic, Bactrim double strength.  (*Id.*)  Dr. Zhang treated Jones again in February 2010 when he complained of chronic back pain and a perianal abscess.  (*Id.* at 102-105.)[7]  At that visit, she prescribed antibiotics for the abscess and Tylenol for the back pain.  (*Id.*)  Dr. Zhang treated Jones for a final time in March 2010.  (*Id.* at 129.)  At that visit, she prescribed Tylenol for Jones's back pain and ointment for his perianal cyst.  (*Id.* at 130.)

Dr. Zhang testified that when an inmate patient appeared at the clinic, she treated whatever their complaint was that day.  She did not look at their entire medical record at each clinic appointment, but she did look at the medical record if she had questions in answering grievances.

---

[7] A perianal abscess is "a superficial anorectal abscess occurring beneath the perianal skin." *Dorland's* at 6.

(Id. at 106-07.)  In her notes she wrote down the problems that brought the inmate to the clinic that day, not always every problem.  (*Id*. at 108.)

Dr. Zhang testified that if she felt an inmate patient needed to see a urologist she would discuss it with the Medical Director.  (*Id.* at 155.)  If an inmate patient told her he wanted to see a urologist, she would tell the patient to go see Dr. Ghosh because he was the Medical Director.  (*Id.* at 156.)  If she saw a patient who needed an outside referral, she would send the patient to the Medical Director who would follow up with the patient and determine whether to complete the paperwork for the collegial review process.  (*Id.* at 73.)  Finally, Dr. Zhang testified that she did not think she recommended that Jones see a urologist.  (*Id.* at 154-55.)

At her deposition in 2014, Dr. Zhang did not recall Jones specifically.  (*Id.* at 112.)  Defendants admit that, during her time at Stateville, Dr. Zhang was aware of Jones's complaints of chronic testicular pain and responded to two of his grievances filed in 2008 and 2009.  (Pl.'s Facts ¶ 18.)  On both occasions, Dr. Zhang stated that Jones's grievances had been resolved.  (*Id*.)  Dr. Zhang testified that epididymitis was not Jones's major problem when she saw him. (Zhang Dep. at 111.)  She testified that she saw patients with epididymitis when she was with the Army and they were successfully treated with antibiotics. (*Id*. at 134-35.)  Because epididymitis can be recurrent, she testified, it can come back after the antibiotics are stopped. (Id at 145.)

Dr. Ghosh personally examined Mr. Jones on four occasions between 2008 and 2011.  (Defs.' Fact Reply ¶ 10.)  In February, 2008, Dr. Ghosh prescribed Ducolax and Zantac for Jones's complaints of constipation and flatulence, and Ibuprofen and Hytrin for Jones's complaints of pain, including testicular pain.  (Ghosh Dep. at 210-13.)

In January 2009, Jones wrote another grievance complaining of chronic epidydimitis. In November 2009, when Dr. Ghosh examined Jones for the second time, he prescribed Colace for constipation and Tylenol for pain. (*Id.* at 225.) In addition, Dr. Ghosh ordered a PSA blood test as well as a testicular ultrasound for Jones because he complained of pain and was tender to the touch. (*Id.*)[8]

Jones's second testicular ultrasound was performed on January 10, 2010 at the University of Illinois. (Def.'s Facts ¶ 18.) That ultrasound revealed a small left testicular cyst. (*Id.*) Based on these findings, Dr. Ghosh concluded that Jones's condition should be watched and a follow up ultrasound should be performed in 18 months to determine whether the cyst had grown. (*Id.* ¶ 19.) After that ultrasound, the medical staff at Stateville continued to treat Jones with pain relievers and anti-inflammatories. (Ghosh Dep. at 240-42.)

Dr. Ghosh examined Jones again in August 2010. (Defs.' Fact Reply ¶ 10.) At that examination, Dr. Ghosh found Jones's left epididymis to be slightly enlarged and slightly tender. (Ghosh Dep at 243.) As a result, Dr. Ghosh prescribed Tylenol and testicular support. (*Id.*) In February 2011, Dr. Ghosh examined Jones for a final time. (Defs.' Fact Reply ¶ 10.) At that examination, he found Mr. Jones's left testicle slightly tender with a thickened epididymis. (Ghosh Dep. at 270.) Dr. Ghosh ordered Naprosyn and testicular support. (*Id.*)[9] Jones continued to be seen

---

[8] The National Cancer Institute defines PSA as "prostate-specific antigen, a protein produced by cells of the prostate gland. The PSA test measures the level of PSA in a man's blood. . . . The blood level of PSA is often elevated in men with prostate cancer." http://www.cancer.gov/cancertopics/factsheet/detection/PSA.

[9] Naprosyn is "trademark for preparation of naproxen." *Dorland's* at 1232. Naproxen is "a non steroidal antiinflammatory drug that is a propionic acid derivative, used in the treatment of pain, inflammation, osteoarthritis, rheumatoid arthritis, gout, calcium pyrophosphate deposition

by various medical personnel at Stateville through March 2011 when Dr. Ghosh retired. (Defs.'
Facts ¶ 20.)

Dr. Ghosh testified that he did not question whether Jones had epididymitis, and that
appropriate treatment for such a condition is scrotal support, antibiotics, and pain medication, all of
which Jones received while in the care of Stateville medical personnel. (Ghosh Dep. at 241-42.)
He believed Jones had chronic pain that was being managed with medication, in part because when
Dr. Ghosh examined him, Jones was not in severe pain. (*Id.* at 320-22.)

Dr. Ghosh also testified that the Wexford Medical Policies and Procedures manual
recommended antibiotics as the first line of treatment for epididymitis and a urology referral as the
second line of treatment. (*Id.* at 327 (referring to Pl.'s Facts, Ex. 7 at 13).) In September 2007 a
physician's assistant made an entry on Jones's medical records for "GU [genital urinary] consult,"
that is, to see a urologist. (Ghosh Dep. at 200-203.) Dr. Ghosh testified that a referral to a urologist
is usually to get tests done. (*Id.* at 327.) In Jones's case, the ultrasounds were done without referral
to a urologist, in order to rule out a pathology, like a tumor. (*Id.* at 328-330.) When the testicular
ultrasounds ruled out a tumor or other pathology, Dr. Ghosh concluded that it was unnecessary to
send Jones to a urologist. (*Id.* at 330.)

Jones states that, in addition to his grievances, he wrote nine informal letters to defendants
between September 2005 and October 2008, describing his chronic testicular pain and the failure of
the treatment prescribed by the defendants. (Pl.'s Facts ¶ 19.) The letters had a variety of
addressees. (*Id.*) Defendants dispute the authenticity of the letters and dispute whether any of the

---

disease, fever, and dysmenorrhea and in the prophylaxis and suppression of vascular headache;
administered orally or rectally." *Id.*

addressees except Wexford received them, but defendants do not cite any testimony by any defendant denying receiving the letters. (Defs.' Reply Facts ¶ 19.) Jones argues that the grievances he filed and letters he wrote to Stateville's medical staff and Wexford's employees show defendants' deliberate indifference towards his condition. (Pl.'s Opp'n at 1.)

Joseph Ebbitt is the Manager of Risk Management at Wexford. (Pl.'s Facts, Ex. 6, Dep. of Joseph Ebbitt at 13.) Ebbitt testified that he wrote a response to Jones's October 2009 letter to Wexford in which he indicated, after discussion with Dr. Ghosh and Dr. Funk, the Regional Medical Director, that the care Mr. Jones received at Stateville was clinically appropriate. (*Id.* at 130-32.)

Jones filed this lawsuit on January 15, 2010.[10] On May, 28, 2013, Jones was referred to a urologist. (Defs.' Fact Reply ¶ 28.) On November 6, 2013, Mr. Jones saw Dr. Ervin Kocjancic, a urologist at University of Illinois at Chicago, who ordered cord denervation surgery. (*Id.* ¶ 29.) Dr. Kocjancic testified that Jones presented to him with scrotal and testicular pain as his chief complaint. (Defs.' Facts, Ex. G, Dep. of Ervin Kocjancic at 26.) Dr. Kocjancic found nothing clinically to indicate that Jones should have pain. (*Id.* at 33-34.) Dr. Kocjancic testified that he could not identify the cause of Jones's pain, and he did not see an indication of epididymitis. (*Id.* at 31-34.) Chronic testicular pain, he testified, can arise from many causes. (*Id.* at 32.) Dr. Kocjancic described the nerve blocks that Jones had earlier received as temporary, while the cord denervation surgery is intended to be permanent. (*Id.* at 37.) The permanent cord denervation surgery has significant risks, and Dr. Kocjancic would try non-invasive options before undertaking denervation

---

[10] In September 2013, Jones received a colonoscopy (Defs.' Facts, Ex. D), after which he dismissed, with prejudice all of his claims relating to gastrointestinal issues, leaving only the claim regarding epididymitis. [Dkt 101.]

surgery.  (*Id*. at 45.)  The fact that Jones responded to the temporary nerve blocks was the best predictive factor that he would benefit from the denervation surgery.  (Id. at 46.)  Dr. Kocjancic discharged Jones and has not seen him since.  (Id. at 57.)  He hopes that the surgery will permanently cure Jones's chronic testicular pain.  (*Id.* at 58.)

Both sides have also submitted opinions by retained experts. Defendants' expert, Dr. Frederick Wohlberg, a urologist, testified that Jones received appropriate treatment at Stateville for chronic epididymitis, specifically, antibiotics, nonsteroidal anti-inflamatories and immobilization of the scrotum. (Pl.'s Facts, Ex. 11, Dep. of Dr. Frederick Wohlberg at 97-98.)  Jones's expert, Dr. Scott Glaser, an anesthesiologist and pain management specialist, does not dispute that those can be appropriate treatments for chronic epididymitis.  Rather, he opines that a referral to a urologist is appropriate "once antibiotic treatment for epididymities is proven ineffective." (Pl.'s Facts, Ex. 1, Report of Dr. Scott Glaser at 6.)  He believes that the defendant doctors erred in the "continual prescribing of these ineffective medications" and, as a result, Jones suffered needlessly from chronic, recurring pain from chronic epididymitis precipitated by blunt force trauma, and that the treatments he received at Stateville put Jones at risk for overprescription of antibiotics.  (*Id.*)


**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment on all or part of a claim or defense is proper, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  To oppose a motion for summary judgment successfully, the responding party may not simply rest on its pleadings, but rather must submit evidentiary materials

showing that a material fact is genuinely disputed. Fed.R.Civ.P 56(c)(1). A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the responsibility of identifying applicable evidence. *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). In determining whether a genuine issue of material fact exists, the court construes all facts and draws all reasonable and justifiable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. The Court may not make credibility determinations, "choose between competing inferences," or weigh the evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

## DISCUSSION

"To sustain his claim of deliberate indifference in violation of the Eighth Amendment, [Jones] must show 'that he had a serious medical need and that a defendant was deliberately indifferent to it.'" *Norfleet v. Webster*, 439 F.3d 392, 395 (7th Cir. 2006) (quoting *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001)).

### I.      Serious medical need.

To demonstrate that he has a serious medical need, a prisoner must show "that his medical condition is 'objectively, sufficiently serious.'" *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "'A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay

person would perceive the need for a doctor's attention.'" *Hayes*, 546 F.3d at 522 (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2008)). Indicators that a prisoner has a serious medical need include: "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir. 1997) (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992)). The parties do not dispute that a serious medical condition is at issue here. Based on the evidence before the court on the motion, Jones has demonstrated, for purposes of summary judgment, that he was suffering from a serious medical condition.

## II.      Deliberate indifference.

In order to meet the deliberate indifference prong of his Eighth Amendment claim, Jones must show that "the defendants' responses to [his pain] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,* 546 F.3d at 524 (citing *Greeno*, 414, F.3d at 653). Negligence, a difference of opinion about how an inmate should be treated, or even admitted medical malpractice does not itself give rise to a constitutional violation. *Norfleet*, 439 F.3d at 396 (citing *Estelle v. Gamble*, 429 U.S. 97, 97 (1976); *Gavin*, 256 F.3d at 898)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." *Norfleet,* 439 F.3d at 396.

Defendants argue that there is no genuine dispute of fact on this point. (Defs.' Mot. ¶ 8.)

They assert that the corporate defendant, Wexford Health Sources, Inc., is entitled to a judgment as a matter of law because Jones has failed to establish or provide sufficient evidence to infer that Wexford has a policy of ignoring inmates with serious medical issues or refusing to refer inmates to specialists in the interest of cost savings. (*Id.*) In addition, defendants argue that defendant physicians are also entitled to judgment as a matter of law because Jones has not produced sufficient medical evidence to suggest that the conduct of the individual defendants, in the context of their treatment of Jones's condition, rose to the level of deliberate indifference as required for liability under 42 U.S.C. § 1983. (*Id.* at ¶ 9.)

There is no doubt that during Jones's time at Stateville he complained of many physical ailments of which his chronic testicular pain was only one, and not always the most serious one. For example, in his grievance of August 2, 2004, he states, "I arrived at Stateville on 6-25-04. I have several medical problems the most serious being hypertension." (Pl.'s Facts, Ex. 8.) Jones goes on to list "severe arthritis and chronic epiddimitis [sic]" as well as severe headaches, dizzyness and numbness of arms and legs. (*Id.*) He acknowledges receiving various medications on June 27, 2004 (two days after his arrival at Stateville) but, he says, no pain medication. He concludes by saying "Are you people trying to kill me?" (*Id.*)

It is likewise undisputed that at Stateville Jones received medical attention and treatment on numerous occasions for a variety of medical conditions. For example, during Dr. Zhang's examination of Jones on December 30, 2008, he was prescribed (or was already taking, the record is not clear) the following medications: gentamycin solution, lactulose, bisacodyl, atenolol, vasotex, hydrochlorothiazide, simvastatin, terazosin, aspirin, erythromycin solution, mycolog cream, and

vitamin A and D ointment.  (Zhang Dep. at 119, discussing Dep. Ex. 25.)

Jones does not argue that he did not receive medical treatment for his conditions, including epididymitis.  He admits that he saw defendant physicians for his testicular pain on at least eleven occasions.  (Pl.'s Facts ¶ 7.)  Rather, he argues that defendants continued to prescribe a course of treatment that was not effective and which left him in constant pain.  (Pl.s Opp'n at 1.)  Jones argues that the refusal to refer him to a urologist in light of the ineffectiveness of the course of treatment showed deliberate indifference. (*Id*.)  Jones's argument is not focused on lack of attention on any particular day but rather the alleged persistence in a course of treatment that had been ineffective over a length of time.

### A.  Dr. Aguinaldo

Dr. Aguinaldo examined Mr. Jones on a single occasion at which Jones exhibited no clinical signs to support a request for an outside referral.  Jones has presented no evidence sufficient to show that Dr. Aguinaldo was deliberately indifferent to Jones's medical needs. Jones asserts that his medical record coupled with his complaints to Dr. Aguinaldo during the appointment were sufficient to reveal that treating his pain with antibiotics and pain medication were not successful.  (Pl.'s Opp'n at 11.)  Jones has not, however, presented evidence to refute  Dr. Aguinaldo's testimony, based on the medical record, that he considered Jones's complaint of  "on and off" testicular pain, examined Jones to see if there were any objective clinical findings justifying a referral and, finding none, treated Jones for intermittent pain, including Jones's other complaints of pain from arthritis, low back pain, neck pain, and knee pain.

Jones argues that one incident may be enough for a claim of deliberate indifference, citing *Gil v. Reed*, 381 F.3d 649, 664 (7th Cir. 2004), where the Seventh Circuit reversed the district court's summary judgment in favor of a prison doctor who prescribed medication for the plaintiff after major surgery in spite of a specialist's specifically warning against that medication. In *Gil*, the court also reversed the district court's grant of summary judgment for a prison employee who angrily refused to provide the same inmate with antibiotics that were both prescribed and available. *Id.* at 661. In so doing, the court held that a jury could find that the prison employee acted with malice demonstrating the subjective element necessary for a deliberate indifference claim. *Id.* at 662. Jones's claim is distinguishable because Dr. Aguinaldo did not disregard explicit instructions on how to treat Mr. Jones, unlike the prison doctor in *Gil*, nor is there evidence that he refused Jones treatment because of malice.

Jones claims that Dr. Aguinaldo laughed and made inappropriate comments when Mr. Jones told him about his chronic testicular pain. (Pl.'s Opp'n at 12.) Although Dr. Aguinaldo denies making the statements, for purposes of summary judgment the court will assume that he made the comments as Jones claims. While inappropriate and unprofessional, those alleged comments are insufficient to demonstrate that Dr. Aguinaldo deprived Jones of necessary medical treatment because Dr. Aguinaldo had a subjectively malicious or deliberately indifferent state of mind. For those reasons, summary judgment is granted to Dr. Aguinaldo.

## B.    Dr. Zhang

Dr. Zhang treated Jones's epididymitis with pain medications and antibiotics, which both

experts agree can be an appropriate treatment. Jones's theory of his case is that the defendant doctors persisted in a course of treatment for his epididymitis that proved to be ineffective over the long term. Thus, the defendant doctors can only be liable if they had sufficient time and occasion to observe that the medications were ineffective over a course of time, as Jones claims.

Viewing all the evidence before the court in the light most favorable to Jones, summary judgment is also granted to Dr. Zhang. No reasonable jury could conclude that Dr. Zhang acted with deliberate indifference to deprive Jones of needed medical care. The record shows that she saw him on six occasions over the course of 17 months. In this lawsuit, Jones focuses only on his complaint about epididymitis, but the record shows that when he came to see Dr. Zhang, he had a number of medical complaints, and that each time she treated him for those complaints, giving priority to the serious conditions such as chest pains and abscesses that brought Jones to the chronic cardiac clinic.

"The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Pyles v. Fahim*, 771 F.3d 403, 408-09 (7th Cir. 2014) (citing *Whitley v. Albers*, 475 U.S. 312, 325 (1986)). "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409 (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Sain v. Wood*, 512 F.3d 886 (7th Cir. 2008)). In the context of all of the treatment that Jones received from Dr. Zhang and the limited time she had to observe him, it cannot be said that her treatment of Jones reflected deliberate indifference to a serious medical need.

## C. Dr Ghosh

Dr. Ghosh, on the other hand, who was the On-site Medical Director at Stateville until 2011, had an opportunity to review Jones's medical condition over a period of seven years, and to review and respond to four grievances Jones wrote. The record before the court, construed most favorably to Jones, includes enough evidence that a reasonable jury might find that Dr. Ghosh was deliberately indifferent to Jones's complaints that the treatment he was receiving was not effective and that he was in pain. Although Dr. Ghosh approved a number of ultrasounds for Jones, at least one of which did not reveal the presence of epididymitis, the parties dispute whether ultrasounds can detect epididymitis. Significantly, Dr. Ghosh refused to approve referring Jones to a urologist. Dr. Ghosh was aware that a physician's assistant had made a note for "GU" consultation for Jones, and he also acknowledged that Wexford's Medical Policies and Procedures manual recommended a urology referral as a second line of treatment for a patient with epididymitis.

Defendants point out that "[u]nder the Eighth Amendment, [plaintiff] is not entitled to demand specific care. [Plaintiff] is not entitled to the best care possible. [Plaintiff] is entitled to reasonable measures to meet a substantial risk of serious harm to her." *Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997). Defendants cite Seventh Circuit case law holding that "[m]ere medical malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). However, *Edwards* also states that "a plaintiff's receipt of *some* medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer that treatment was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' a medical condition." *Id.* (emphasis in

original) (quoting *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir. 1996)). The court in *Edwards* reversed the district court's dismissal of the plaintiff's deliberate indifference claim because the record was silent on why the plaintiff was made to wait two days for treatment beyond antibiotics and pain medication, what the medical effects of the delay were, or whether such a delay was reasonable. *Edwards*, 478 F.3d at 831 (citing *Gutierrez v. Peters*, 111 F.3d at 1372 (stating that "delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims")).

The Seventh Circuit recently reviewed previous decisions regarding referring inmates to specialists. *Pyles*, 771 F.3d 403. The court observed that a prison doctor is not necessarily required to refer an inmate to a specialist in order to provide constitutionally sufficient medical care. *Id* at 411. "Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is 'blatantly inappropriate.'" *Id*. (citing *Self* v. *Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006); *Roe*, 631 F.3d at 858).

In the course of affirming summary judgment for the defendant doctor in *Pyles,* the court discussed cases in which it held that failure to authorize a referral allowed an inference of deliberate indifference. "[I]n *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010), we concluded that summary judgment in favor of a jail physician was unwarranted because the physician, in response to complaints of severe unremitting and unexplained tooth pain, had 'rejected the obvious alternative of referring [the prisoner] to a dentist.'" *Pyles,* 771 F.3d at 411 (quoting *Berry,* 604 F.3d at 441). The court also discussed a case involving a request to see a urologist, although in circumstances

different circumstances from Jones's. "In *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008), a prison physician's refusal to authorize a visit to a urologist to treat a prisoner's painful scrotal cysts and spasms, in the face of increasing pain and after a previous physician had spoken to a urologist about the prisoner's condition, was sufficient to create a triable issue of fact." *Pyles,* 771 F.3d at 411 (citing *Hayes*, 546 F.3d at 524-26). The principle, the court said, is "that if the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the 'obdurate refusal' to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition." *Pyles,* 771 F.3d at 412 (citing *Greeno*, 414 F.3d at 654 (reversing summary for medical defendants who denied an inmate suffering from an esophageal ulcer referral to a specialist and persisted in treatments known to be ineffective)).

In light of these precedents and construing the record on the motion most favorably for Jones, a jury could find that Dr. Ghosh, the On-site Medical Director and the doctor at Stateville with authority to request collegial review for a referral to a urologist, was deliberately indifferent to Jones's medical needs by not engaging in the process for a urology referral. This is not, however, to conclude that a jury will necessarily so find after all the evidence is presented. Jones has an extensive history of many medical complaints and many medical treatments at Stateville. It is possible that Jones will not be able to sustain the "heavy burden" of proving that Dr. Ghosh's decisions, when viewed in light of Jones's entire medical experience at Stateville, will fall below the necessary constitutional standard. The court only concludes that Dr. Ghosh has not demonstrated that summary judgment is appropriate. For those reasons, summary judgment is denied with respect to Dr. Ghosh.

**D. Wexford**

For purposes of § 1983, a private corporation like Wexford that acts under color of state law violates an inmate's constitutional rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Woodward v. Corr. Med. Servs. of Illinois, Inc.,* 368 F.3d 917, 927 (7th Cir. 2004) (quoting *Estate of Novack ex rel. v. County of Wood,* 226 F.3d 525, 530 (7th Cir. 2000)). For the corporation to be liable, a corporate policy must be the direct cause or moving force behind the constitutional violation. *Woodward*, 368 F.3d at 927. *Respondeat superior* liability does not apply in that situation. *Shields v. Illinois Dep't of Corr.* 746, F.3d 782, 789 (7th Cir. 2014).

Jones puts forth three arguments why Wexford should be denied summary judgment. (Pl.'s Opp'n at 13-17.)[11] One of his arguments relies on the theory of *respondeat superior*, which Jones acknowledges is not recognized by Seventh Circuit precedent as a basis for liability for corporate defendants on § 1983 claims. (*Id.* at 17 n 4.) Jones wishes to preserve the issue for possible

---

[11] Jones argues in a footnote that Wexford is precluded by the doctrine of collateral estoppel from denying that its On-site Medical Directors are the final policymakers regarding inmate medical care. (Pl.'s Opp'n at 14 n. 3.) Arguments raised only in footnotes are waived. *See, e.g., U.S. v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) (collecting cases) ("[B]y failing to raise this issue other than by a passing reference in a footnote, White has waived it.") Jones's footnote argument illustrates why that is so. Whether the ruling Jones cites – an interlocutory decision in *Fox v. Barnes,* 09 C 5453 (N. D. Ill. Jan. 19, 2012), that an On-site Medical Director at a Reception and Classification Center is a policymaker for Wexford regarding distributing medication to inmates at that Reception Center – should be given collateral estoppel effect in this case is questionable. Consideration of such an argument would require examining the context of the ruling in *Fox v. Barnes* and the fairness of its application here. Even when an issue has been determined in a *final* judgment, the application of collateral estoppel in a different proceeding between different parties is subject to considerations not broached in Jones's cursory treatment. *See* Restatement (Second) of Judgments § 29 (1982) (listing eight considerations for applying issue preclusion in subsequent litigation with another party).

appellate review.[12]  However, because *respondeat superior* does not supply a basis for liability in this case, it is not a reason to deny Wexford summary judgment.

Under existing precedent, Wexford can be held liable under § 1983 if the unconstitutional act is caused by: "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dept.,* 604 F.3d 293, 303 (7th Cir. 2009); *Walker v. Sheahan,* 526 F.3d 973, 955 (7th Cir. 2008).  Jones argues that the latter two circumstances exist here.

### 1. Widespread Practice of Ignoring Inmate Grievances

Jones argues that Wexford is liable for his injures because they were caused by a widespread practice of ignoring inmate grievances and treatment requests.  (Pl.'s Opp'n at 15.) A plaintiff pursuing a widespread practice theory of liability must show that policymakers were deliberately indifferent to the obvious consequences of that practice.  *Thomas,* 604 F.3d at 303.  Courts have not adopted "bright-line rules defining a 'widespread custom or practice,'" but have held that the plaintiff must demonstrate that the occurrence is not a random event.  *Id.*  This may take the form of a series of bad acts showing deliberate indifference thereby creating an inference that officials were aware of and condoned the behavior.  *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir. 2010). Additionally, the plaintiff must show that this widespread practice caused him a constitutional injury. *See Petty v. City of Chicago*, 754 F.3d 416, 424-25 (7th Cir. 2014).

---

[12]  Jones raises the issue in light of  the *Shields* decision which suggests that the Seventh Circuit may reconsider its precedents.  746 F.3d at 789-96.

Jones presents no evidence other than his own experience to support his claim of a widespread practice of ignoring inmate grievances. He acknowledges that an isolated act is not sufficient to impose liability on an employer, but he argues that the treatment of a single individual over an extended period of time can show a widespread practice sufficient to impose liability on the employer. (Pl.'s Opp'n at 15-16.) He cites two district court cases in which those defendant doctors ignored inmates' written requests for treatment for a period of time. In both of those cases the district court denied summary judgment because the plaintiff provided evidence that his letters and grievances were ignored entirely. In *Watkins v. Ghosh*, No. 11 C 1880, 2014 WL 840949 (N.D. Ill. March, 4, 2014), there was evidence to suggest that the plaintiff did not receive medical care of any kind for one year after a magnetic resonance imaging ("MRI") revealed disc herniation and the plaintiff had submitted several written requests for treatment. Similarly, evidence in *Gallo v. Ghosh*, No. 08 C 6974, 2013 WL 5587081 (N.D. Ill. Oct. 10, 2013), suggested that the plaintiff received incorrect medication that aggravated his symptoms after his colonoscopy and had to wait eight months before seeing a doctor although he submitted multiple grievances. Here, it is not correct to say that defendants ignored Jones's grievances; Dr. Ghosh, Dr. Zhang, and Joseph Ebbitt all responded to Jones's grievances, and Jones was provided treatment that was appropriate to his complaint of epididymitis, although, he claims, not effective over the long term.

The Seventh Circuit decision in *Shields,* which postdates both *Watkins* and *Gallo,* informs the decision here. In *Shields*, the plaintiff received some medical attention for his injury but through a series of oversights and delays by a number of medical personnel including Wexford employees, his injury became a serious and permanent impairment. *Shields*, 746 F. 3d at 785. The court

concluded that such a series of isolated incidents "do not add up to a pattern of behavior that would support an inference of custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to Shields's needs." *Id.* at 796.

Jones has not presented sufficient evidence that the decision not to provide him with a urology referral was the result of a widespread practice amounting to a custom or policy by Wexford to ignore inmate grievances.

### 2. *Policymaker with final authority.*

Jones also argues that Wexford is liable because Dr. Ghosh, as On-site Medical Director at Stateville, had the relevant policymaking authority at Stateville and his actions caused Jones's injury. (Pl.'s Opp'n at 13-14.)   As factual support, Jones relies on the contract between Wexford and the Illinois Department of Corrections ("IDOC") (Pl.'s Facts, Ex. 4 ("Wexford Contract")), and the fact that Dr. Ghosh's approval was required in order for an inmate's records to be evaluated by the collegial review board for possible referral to a specialist.  (Ghosh Dep. at 90-91.)

A corporation that acts under color of law may, like a municipality, be liable under § 1983 if an individual with final policy-making authority on the subject in question caused the constitutional violation.  *See Valentino v. Vill. of S. Chicago Heights,* 575 F.3d 664, 675-76 (7th Cir. 2009) (citing *Monell v. City of New York,* 436 U.S. 658, 690 (1978)).  The relevant policymaker is the person with final policymaking authority over the particular area or on a particular issue. *Valentino*, 575 F. 3d at 676 (citing *McMillian v. Monroe County,* 520 U.S. 781, 785 (1997)).  That must be someone whose acts "may fairly be said to represent the official policy . . . ." *Valentino*, 575

F.3d at 674-75 (quoting *Monell*, 436 U.S. at 694). A person may be the decisionmaker in a particular area without being the policymaker in that area. *Valentino*, 575 F.3d at 675. The fact that an official has discretion in the exercise of particular functions does not, without more, give rise to municipal (or corporate) liability based on an exercise of that discretion. *See id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986)).

The only evidence Jones presents to support his argument is the Wexford Contract, which defines the On-site Medical Director as "the Vendor [Wexford] employee at each Center who provides services as a lead worker for staff in the Center health care unit." (Wexford Contract § 2.1.18.) Under the contract, Wexford must give each member of the health care staff a written job description that delineates the staff member's assigned responsibilities. (*Id.* § 2.4.1.11(a).) Each employee's job performance is monitored by both Wexford and IDOC. (*Id.*) The Illinois Department of Healthcare and Family Services has input into determining the assigned responsibilities and monitoring of the employee's performance. (*Id.*)

The job description for the On-site Medical Director requires that person to "provide the overall supervision for clinical services at the contract facility; shall attend patients, provide medical consultation for the staff and correctional executives, and conduct the liaison function for clinical matters with medical providers outside the Center." (*Id.* at 82.) His duties are divided into administrative, training and orientation, staff recruitment and evaluation, quality assurance, clinical duties, and referrals to outside hospitals or specialists, "subject to the approval of the facility's Chief Administrative Officer or his designee." (Id. at 82-84.)

Jones points to one provision of the Wexford Contract that describes the On-site Medical

Director of Stateville as the "medical authority" and who is required to "plan, implement direct and control all aspects of the health care program." (Pl.'s Opp'n at 14.) That section states in full:

> The On-site Medical Director at the Center shall serve as the medical authority and shall coordinate with the HCUA in the execution of the duties under this Contract. The On-site Medical Direct shall operate the health care program in accordance with State Regulations, and with performance-based audit standards of the American Medical Association (AMA), American Correctional Association (ACA) and IDOC. The On-site Medical Director shall plan, implement, direct and control all clinical aspects of the health care program. In addition to administrative responsibilities, the On-site Medical Director shall also provide primary health care services on a routine basis.

(Wexford Contract § 2.4.2.1.)

That section does not say that the On-site Medical Director sets policy for Wexford. In fact, as Jones points out, Wexford provides the medical staff, including the Medical Director, with Wexford's Medical Policies and Procedures manual. (Pl.'s Facts, Ex. 7.) Jones argues that Dr. Ghosh violated Wexford's Policies and Procedures Manual, which Jones reads as requiring referral to a urologist. (Pl.s' Opp'n at 6.)

The On-site Medical Director may *request* that Wexford's corporate office approve a referral for a consultation, and Wexford's corporate office must respond to that request in five business days. (Wexford Contract § 2.3.21). The On-site Medical Director may appeal a denial of a requested referral to Wexford's corporate office, and if the denial is affirmed, the On-site Medical Director may appeal to the IDOC Medical Director who makes the final determination. (*Id*.)

Those contract provisions do not support Jones' claim that Dr. Ghosh is a final policymaker for Wexford; rather, they indicate that he is a decisionmaker who exercised certain discretion delegated to him by Wexford. The fact that he decided not to request a referral in Jones's situation,

although it meant that Jones did not get a referral, does not mean that he made Wexford's policy about referrals.

In summary, although Dr. Ghosh may be liable for his actions in Jones's medical treatment (if the jury so determines), Jones has not provided sufficient evidence to demonstrate that Wexford can be liable under § 1983 for those actions in the absence of *respondeat superior* liability.

## CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment [107] is granted as to defendants Evaristo Aguinaldo, Liping Zhang and Wexford Health Sources, Inc., and denied as to Partha Ghosh. This matter is set for status hearing on April 2, 2015 at 9:45 a.m .

IT IS SO ORDERED.


Dated: March 19, 2015

_____
Geraldine Soat Brown
United States Magistrate Judge